UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| NPI HILLCREST INVESTOR GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:25-cv-50206 |
| | ) | |
| KNIGHT SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, NPI Hillcrest Investor Group, LLC, by its undersigned attorneys, for its Complaint against Defendant, Knight Specialty Insurance Company, states:

## PARTIES and JURISDICTION

1.      Plaintiff, NPI Hillcrest Investor Group, LLC ("NPI"), is an Illinois limited liability company doing business as Legacy Cannabis.

2.      The members of NPI are: Youngs Road Medicine LLC; KAML LLC; and Suntrust Farms LLC.

3.      The members of Youngs Road Medicine LLC are RS-Youngs Road Investment Trust and KS-Youngs Road Investment Trust.

4.      The trustee of RS-Youngs Road Investment Trust and the trustee of KS-Youngs Road Investment Trust is Brian Zabel, domiciled in Newark, Illinois.

5.      The members of KAML LLC are Keith McGinnis, domiciled in Ottawa, Illinois, and Brian Zabel, domiciled in Newark, Illinois.

6.      The members of Suntrust Farms LLC are: Youngs Road Medicine II LLC; KAML III LLC; White Tie Holdings LLC; and JKV Investments LLC.

1

7.     The members of Youngs Road Medicine II LLC are RS-Youngs Road Investment Trust, KS-Youngs Road Investment Trust, and BH-Youngs Road Investment Trust, the trustee of which is Brian Zabel, who is domiciled in Newark, Illinois.

8.     The members of KAML III LLC are Keith McGinnis, domiciled in Ottawa, Illinois, and Brian Zabel, domiciled in Newark, Illinois.

9.     The members of White Tie Holdings LLC are the Gregory R. Hill Living Trust and the Reeves Bayview Deed of Settlement Trust.

10.     The trustee of the Gregory R. Hill Living Trust is Gregory R. Hill, domiciled in Morris, Illinois.

11.     The trustee of the Reeves Bayview Deed of Settlement Trust is Michael Weiss, domiciled in Northbrook, Illinois.

12.     The members of JKV Investments LLC are Karen Vinachi and Joseph Vinachi, both domiciled in Morris, Illinois.

13.      Defendant, Knight Specialty Insurance Company ("Knight Specialty"), is a citizen of Delaware and California, being a Delaware corporation with its principal place of business in Los Angeles, California.

14.     This Court has subject matter jurisdiction over this matter pursuant to Title 28, U.S.C. § 1332(c)(1) because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

15.     Venue is proper in this Court pursuant to Title 28, U.S.C. § 1391 because the events giving rise to NPI's claims occurred in this judicial district. Additionally, Knight Specialty does business and/or transacts business in this judicial district and, therefore, it is subject to personal jurisdiction in this judicial district and resides here for venue purposes.

2

**FACTS**

16.     QuadScore Insurance Services LLC ("QuadScore") is a specialty risk program founded with the purpose of providing comprehensive insurance solutions for the legal cannabis industry.

17.     QuadScore is the cannabis insurance program administrator for Knight Specialty.

18.     Underwriting, including quoting, binding, and issuing of insurance policies and loss prevention underwriting inspections, is part of the authority delegated by Knight Specialty to QuadScore as its cannabis insurance program administrator.

19.     Global Risk Consultants Corp. ("GRC") performs loss prevention underwriting inspections for insurance program administrators like QuadScore and for insurance companies like Knight Specialty.

20.     Knight Specialty issued to Plaintiff an insurance policy effective January 12, 2023 through January 12, 2024 ("the original insurance policy").

21.     The premium for the original insurance policy was $193,298.

22.     The original insurance policy provided various property coverages pertaining to NPI's cannabis grower operations in Rochelle, Illinois, including insuring NPI against direct physical loss of or damage to its buildings and to its business personal property caused by fire.

23.     The original insurance policy "Common Policy Conditions" states in relevant part as follows:

> "**D. Inspections And Surveys**
>
>    **1.** We have the right to:
>
>       **a.**  Make inspections and surveys at any time;
>
>       **b.**  Give you reports on the conditions we find; and

      **c.** Recommend changes.

     **2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged." (Emphasis in original).

24.    As of January 12, 2023, QuadScore's underwriting requirements included a loss prevention underwriting inspection after binding insurance coverage for a new risk.

25.    Global Risk Consultants ("GRC") was hired by QuadScore to perform a loss prevention underwriting inspection of NPI's cannabis grower operations in Rochelle.

26.    One of the reasons for the loss prevention underwriting inspection was to allow QuadScore/Knight Specialty to verify the accuracy of the information in an insurance application for the original insurance policy submitted by NPI to QuadScore.

27.    Another reason for the loss prevention underwriting inspection was to allow QuadScore/Knight Specialty to cancel the original policy if the inspection revealed: (a) the policy was obtained through a material misrepresentation; (b) NPI had violated any of the terms and conditions of the original policy; or (c) the risk originally accepted had measurably increased.

28.    Nora London ("London"), a GRC District Manager and Senior Consultant, performed loss prevention underwriting inspections of NPI's Rochelle facility on April 25, 2023 and May 10, 2023.

29.    London was and is an experienced loss prevention consulting professional skilled in Fire Protection Engineering, Risk Management, Property and Casualty Insurance, and Fire Protection.

30.    Based on her background, training, and experience as a loss prevention consulting professional, London knew and understood at the time of her inspections that a third-party vendor like GRC hired by a program administrator/insurance company to perform a loss prevention

4

underwriting inspection is the program administrator's/insurance company's "eyes and ears" for that purpose.

31.    Based her background, training, and experience as a loss prevention consulting professional, London knew and understood at the time of her inspections that underwriters rely on a third-party vendor like GRC hired to perform a loss prevention underwriting inspection, and that they expected the vendor to be thorough, accurate, and complete during the inspection.

32.    It is understood and accepted practice in the property insurance industry that a third-party vendor like GRC hired to perform a loss prevention underwriting inspection on behalf of a program administrator/insurance company is its "eyes and ears" for purposes of the inspection.

33.    London was QuadScore's/Knight Specialty's "eyes and ears" for purpose of the loss prevention underwriting inspections.

34.    London had unlimited access to NPI's Rochelle facility during her inspections, including the greenhouse and its eight grow rooms where cannabis plants are grown.

35.    London prepared a 24-page "Loss Prevention Report" ("the Report") following her inspections.

36.    The Report contained the following information regarding the grow rooms in the greenhouse:

> "Seeds are provided by vendors to propagate the plants. Cannabis plants are grown in the greenhouse in one of eight separate grow rooms. The Plants are grown on one tier racking systems. Rooms are ventilated. Plants are monitored for environmental conditions and watering. Fertilizer is included in the water. Greenhouses have a low continuity of combustibles. Seven of the rooms are for growing with the last for propagation (mother room). Each of the seven rooms produces 100 to 250 lbs. of raw materials."

37.    Notwithstanding her inspection of the eight grow rooms in the greenhouse, London failed to disclose in the Report that there were no smoke detectors in each of the grow rooms.

5

38.     While the Report noted the presence of smoke detectors in the main building, and recommended that smoke detectors be added to the security hub and to the argus rooms (computer and electronic equipment rooms), it did not make any recommendations or identify any corrective actions that needed to be taken regarding the lack of smoke detectors in each of the eight grow rooms.

39.     Knight Specialty renewed the insurance coverage for the Building effective January 12, 2024 to January 12, 2025 ("the renewal insurance policy"), a copy of which is attached to this Complaint as Exhibit A.

40.     The premium for the renewal insurance policy was $149,811.

41.     The renewal insurance policy provided various property coverages pertaining to NPI's cannabis grower operations in Rochelle, including insuring NPI against direct physical loss of or damage to its buildings and to its business personal property caused by fire.

42.     On January 19, 2024, a fire originated in one of the greenhouse grow rooms, causing extensive damage throughout NPI's facility ("the fire loss").

43.     NPI notified QuadScore/Knight Specialty of the fire loss and submitted a claim for benefits under the renewal insurance policy.

**COUNT I**
**(Declaratory Relief: Substantial Compliance with the APSWE)**

44.     NPI realleges paragraphs 39 through 43 of the Facts of the Complaint as paragraph 40 of Count I of the Complaint.

45.     NPI disclaimed coverage for the fire loss based on NPI's purported breach of an "Additional Protective Safeguards Warranty Exclusion" ("APSWE") to the renewal insurance policy.

6

46.     The APSWE contained a "Smoke Detector Protective Safeguard", which provided in relevant part as follows:

> "**P-1.   Smoke Detector Protective Safeguard**
>
> > **A.** In consideration of the premium at which this policy is written, it is a condition of this policy that the insured premises listed in the schedule above is equipped with smoke detectors that are located throughout the building and in each grow room. They should be hardwired, remotely monitored, and provide alerts when no one is in the building. The insured must maintain monitor servicing records and provide yearly evidence of a monitoring service contract in place to this Company.
> >
> > The insured shall exercise due diligence in maintaining in complete working order all equipment and services pertaining to the operation of this system which are under the control of the insured and shall give immediate notice of any impairment in or suspension of the smoke detectors equipment or service, known to the insured, to this Company.
> >
> > **B.** The following is added to the Exclusions section of the Causes of Loss – Special Form:
> >
> > **Additional Protective Safeguards Warranty – Smoke Detector Condition**
> > We will not pay for loss or damage caused by smoke or fire if, prior to the loss or damage, you failed to comply with each Protective Safeguard set forth in Section **A.** above." (Emphasis in original).

47.     NPI substantially complied with the Smoke Detector Protective Safeguard by virtue of a smoke detector installed in the HVAC ductwork that was connected to each of the grow rooms.

48.     An actual controversy exists between NPI and Knight Specialty as to insurance coverage for the fire loss as the preceding paragraphs demonstrate. Pursuant to Federal Rule of Civil Procedure 57, this Court is vested with the power to declare the rights and the liabilities of the parties hereto and to give such other and further relief as may be necessary.

Wherefore, NPI prays that this Court: (a) determine and adjudicate the rights and the liabilities of the parties with respect to the renewal insurance policy and coverage for the fire loss; (b) find and declare that NPI substantially complied with the APSWE Smoke Detector Protective Safeguard; and (c) grant any additional and further relief it deems just and proper.

## COUNT II
### (Alternative Pleading: Declaratory Relief-Waiver of the APSWE)

49.     NPI realleges paragraphs 16 through 43 of the Facts and paragraphs 45 and 46 of Count I of the Complaint as paragraph 49 of Count II of the Complaint.

50.     The Smoke Detector Protective Safeguard is a condition that is for Knight Specialty's benefit and protection.

51.     As QuadScore's/Knight Specialty's "eyes and ears" in evaluating the insurability of NPI, and its authorized representative for purpose of the loss prevention underwriting inspections of NPI's facility, London's knowledge and her acts and/or omissions are imputed to QuadScore/Knight Specialty.

52.     London knew or, in the exercise of ordinary diligence, could have and should have known from her loss prevention underwriting inspections of NPI's facility that there were no smoke detectors in the eight grow rooms in the greenhouse.

53.     Knight Specialty had constructive knowledge that there were no smoke detectors in the eight grow rooms in the greenhouse.

54.     Following London's inspections, Knight Specialty had the right to cancel the original insurance policy, rescind the original insurance policy, adjust the policy premium, or demand that NPI come into compliance with the Smoke Detector Protective Safeguard.

55.     Instead of exercising its rights, Knight Specialty did not object to NPI's purported breach of the Smoke Detector Protective Safeguard, continued to insure NPI through the original

insurance policy period, renewed the insurance policy for a second policy period, and accepted premiums for both insurance policies.

56.     Knight Specialty waived its right to assert the Smoke Detector Protective Safeguard as a basis for no coverage for the fire loss.

57.     An actual controversy exists between NPI and Knight Specialty as to insurance coverage for the fire loss as the preceding paragraphs demonstrate. Pursuant to Federal Rule of Civil Procedure 57, this Court is vested with the power to declare the rights and the liabilities of the parties hereto and to give such other and further relief as may be necessary.

Wherefore, NPI prays that this Court: (a) determine and adjudicate the rights and the liabilities of the parties with respect to the renewal insurance policy and coverage for the fire loss; (b) find and declare that Knight Specialty waived its right to assert the APSWE Smoke Detector Protective Safeguard as a basis for its denial of coverage for the fire loss; and (c) grant any additional and further relief it deems just and proper.

## COUNT III
### (Alternative Pleading: Declaratory Relief-Estoppel to Assert the APSWE)

58.     NPI realleges paragraphs 49 through 55 of Count II of the Complaint as paragraph 58 of Count III of the Complaint.

59.     During her inspections, London never advised NPI that it was not in compliance with the Smoke Detector Protective Safeguard due to the lack of smoke detectors in the eight grow rooms in the greenhouse and that coverage would not be afforded for a fire loss as a result.

60.     During her inspections, London never advised NPI that the smoke detector installed in the HVAC ductwork that was connected to each of the grow rooms did not substantially comply with the Smoke Detector Protective Safeguard and that coverage would not be afforded for a fire loss as a result.

61.     Based on the inspections performed by London, and her failure to inform it otherwise, NPI believed that it was in compliance with the Smoke Detector Protective Safeguard.

62.     NPI reasonably relied to its detriment on London's inspections. If she would have advised NPI during her inspections that it was not in compliance with the Smoke Detector Protective Safeguard, then NPI would have taken the appropriate measures to cure any alleged non-compliance, including placing a smoke detector in each of the eight grow rooms in the greenhouse.

63.     NPI's belief that it was in compliance with the Smoke Detector Protective Safeguard as of London's inspections was reasonable. NPI received a copy of the Report on July 6, 2023. As previously explained, while the Report recommended that smoke detectors be added to the security hub and to the argus rooms (computer and electronic equipment rooms), it did not make any recommendations or identify any corrective actions that needed to be taken regarding the lack of smoke detectors in each of the eight grow rooms. Nor did the Report advise that the smoke detector installed in the HVAC ductwork that was connected to each of the grow rooms failed to substantially comply with the Smoke Detector Protective Safeguard.

64.     Knight Specialty is equitably estopped from invoking the Smoke Detector Protective Safeguard as a basis for no coverage for the fire loss.

65.     An actual controversy exists between NPI and Knight Specialty as to insurance coverage for the fire loss as the preceding paragraphs demonstrate. Pursuant to Federal Rule of Civil Procedure 57, this Court is vested with the power to declare the rights and the liabilities of the parties hereto and to give such other and further relief as may be necessary.

Wherefore, NPI prays that this Court: (a) determine and adjudicate the rights and the liabilities of the parties with respect to the renewal insurance policy and coverage for the fire loss;

(b) find and declare that Knight Specialty is equitably estopped from invoking the APSWE Smoke

Detector Protective Safeguard as a basis for its denial of coverage for the fire loss; and (c) grant

any additional and further relief it deems just and proper.

### COUNT IV
### (Declaratory Relief-Common Policy Condition J.)

66.     NPI realleges paragraphs 49 through 56 and paragraphs 59 through 64 of the

Complaint as paragraph 66 of Count IV of the Complaint.

67.     Paragraph J. of the renewal insurance policy's Common Policy Conditions states

as follows:

> **"J. Materiality of Representations Made**
>
> The information provided in this application, submission and underwriting process concerning the nature of the operation of your business is considered material to the process of underwriting, pricing and the offer of this policy. This policy would not be offered but for this information related to the nature of your business operations. A copy of the application is attached to and made part of this policy.
>
> We may deny coverage for any liability arising out of a material change in the operation of your business from the information provided in the application and submission process, unless we are advised in writing, prior to any planned change in the nature of the operation of your business. Coverage shall only apply if we agree to provide coverage for such change in operations and we endorse your policy with the requested changes.
>
> Any and all changes must be reported to us, in writing, no later than 14 (fourteen) calendar days prior to the state date of said changes. Based upon your provision of notice to us with regard to a planned change in the nature of the operation of your business, it may be necessary for us to charge an additional premium in order to provide coverage. If we agree to provide coverage based upon the payment of additional premium, said coverage will not be provided until receipt of the premium by us." (Emphasis in original).

68.     Knight Specialty also disclaimed coverage for the fire loss based on NPI's alleged violation of Paragraph J., reasoning as follows in its coverage declination letter:

> "Based on KSIC's investigation, it appears that NPI Hillcrest misrepresented on the Application that the grow rooms contained smoke detectors. The presence of smoke detectors in the grow rooms was clearly an important requirement concerning the issuance of the Policy as it was the subject of an express inquiry on the application and as the presence of smoke detectors in the grow rooms is a condition precedent to coverage pursuant to the Additional Protective Safeguards Warranty Exclusion. The lack of smoke detectors in the grow rooms is a material change in the operation of NPI Hillcrest's business from the information provided in the application and submission process. KSIC was not advised in writing of this change or inconsistency with the information provided in the application and submission process. Accordingly, NPI Hillcrest violated Paragraph J. of the Common Policy Conditions. KSIC respectfully denies coverage for this claim on that additional basis."

69.     The lack of smoke detectors in the grow rooms was not a material change in NPI's operations. There never were smoke detectors in the grow rooms between January 12, 2023, when Knight Specialty first started insuring NPI, and January 19, 2024, when the fire occurred.

70.     Nor was the presence of smoke detectors in the grow rooms material to Knight Specialty's decision to insure NPI. After it had constructive knowledge from London's loss prevention underwriting inspections on April 25, 2023 and May 10, 2023 that there were no smoke detectors in the grow rooms, contrary to what was stated in the application for the original insurance policy, Knight Specialty continued to insure NPI through the original insurance policy period, and then renewed the original insurance policy for a second policy period, despite the renewal application stating there were smoke detectors in the grow rooms.

71.     Knight Specialty waived and/or is estopped from asserting Paragraph J. of the Common Policy Conditions as a basis for refusing to cover the fire loss.

72.     An actual controversy exists between NPI and Knight Specialty as to insurance coverage for the fire loss as the preceding paragraphs demonstrate. Pursuant to Federal Rule of Civil Procedure 57, this Court is vested with the power to declare the rights and the liabilities of the parties hereto and to give such other and further relief as may be necessary.

Wherefore, NPI prays that this Court: (a) determine and adjudicate the rights and the liabilities of the parties with respect to the renewal insurance policy and coverage for the fire loss; (b) find and declare that Paragraph J. of the Common Policy Conditions is not a basis for Knight Specialty refusing to cover the fire loss; and (c) grant any additional and further relief it deems just and proper.

## COUNT V
### (Breach of Contract)

73.     NPI realleges paragraphs 16 through 71 of the Complaint as paragraph 73 of Count V of the Complaint.

74.     NPI has substantially performed all post-loss conditions required by the renewal insurance policy to be performed by it, requested of it, and/or not waived by Knight Specialty including, but not limited to, giving prompt notice of the loss, producing requested documentation, cooperating with Knight Specialty in the investigation of the fire loss and ensuing claim, and timely filing suit.

75.     Although requested to do so, Knight Specialty has failed and refused to pay the cost to repair/replace the damage to NPI's buildings and business personal property, as well as the loss of business income NPI sustained due to the partial suspension of its cannabis growing operations from the fire, which failure and refusal constitutes a breach of the insurance policy.

76.     This breach of the renewal insurance policy was and is the direct and proximate cause of damage to NPI in an amount in excess of $75,000.

77.     This is an action based on a "written instrument" within the meaning of the Illinois Interest Act and, therefore, NPI is entitled to prejudgment interest.

Wherefore, NPI prays for judgment in its favor and against Knight Specialty in an amount in excess of $75,000, plus prejudgment interest and costs.

## COUNT VI
## (Section 155 Relief)

78.     Plaintiff realleges paragraphs 1 through 76 of the Complaint as paragraph 78 of count VI of the Complaint.

79.     At the time of the loss, Knight Specialty's internal claim handling policies, practices, and procedures included compliance with Part 919 of the Illinois Administrative Code and compliance with sections 154.5 and 154.6 of the Illinois Insurance Code.

80.     NPI is entitled to an award of taxable costs under section 155 of the Illinois Insurance Code by virtue of Knight Specialty engaging in the following vexatious and unreasonable conduct:

(a)     failing to pay NPI for the fire loss within 40 days of the loss, thus constituting an unreasonable delay in paying the claim as a matter of law, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(A) of Part 919 of the Illinois Administrative Code;

(b)     failing to provide NPI with a reasonable explanation for the delay in resolving its fire loss and ensuing claim, after the claim remained unresolved for more than 75 days, in violation of the regulations promulgated by the Illinois Director of Insurance within section 919.80(d)(7)(B) of Part 919 of the Illinois Administrative Code;

(c)     not attempting in good faith to effectuate a prompt, fair, and equitable settlement of the fire loss and ensuing claim, in violation of section 154.6(b) of the Illinois Insurance Code

and the regulations promulgated by the Illinois Director of Insurance within section 919.50(a) of Part 919 of the Illinois Administrative Code;

(d)     refusing to pay for NPI's covered fire loss without conducting a full, fair, and objective investigation based on all available facts and circumstances, in violation of section 154.6(h) of the Illinois Insurance Code;

(e)     refusing to pay for NPI's covered fire loss based on its purported violation of the APSWE Smoke Detector Protective Safeguard, despite conduct that Knight Specialty knew or should have known constitutes a waiver of the right to now assert that provision as a basis for not paying for the fire loss;

(f)     refusing to pay for NPI's covered fire loss based on its purported violation of the APSWE Smoke Detector Protective Safeguard, despite conduct that Knight Specialty knew or should have known estops it from now asserting that provision as a basis for not paying for the fire loss;

(g)     refusing to pay for NPI's covered fire loss based on NPI's alleged violation of Paragraph J. of the Common Policy Conditions, despite conduct that Knight Specialty knew or should have known waives its right to rely upon or estops it from now asserting that provision as a basis for not paying for the fire loss;

(h)     without proper cause, wrongfully and knowingly refusing to reimburse NPI for all its covered fire loss;

(i)     failing to be fair, open, and to carry out its part of the bargain under the renewal insurance policy in good faith; and

       (j)      forcing NPI to retain legal counsel to investigate the fire loss and ensuing claim and to file a lawsuit to recover the benefits that should have been immediately forthcoming under the renewal insurance policy.

       WHEREFORE, NPI prays for an award of attorney fees and other taxable costs under section 155 of the Illinois Insurance Code in its favor and against Knight Specialty.

       **NPI demands a trial by jury.**

/s/ Edward Eshoo, Jr.
Edward Eshoo, Jr.
Christina M. Phillips
MERLIN LAW GROUP
181 West Madison, Suite 3475
Chicago, Illinois 60602
Telephone: (312) 260-0806
Facsimile: (312) 260-0808
eeshoo@merlinlawgroup.com
cphillips@merlinlawgroup.com
Attorneys for Plaintiff